IRVING, J.,
dissenting:
¶ 25. The majority finds that the trial court did not err in not allowing Cody Bromfield’s attorney to cross-examine Dr. Ledon Langston concerning Dr. Lang-ston’s use of forceps during the delivery of Cody, and concerning the change or correction by Dr. Langston of his delivery notes. The phrase “mid-forceps” delivery was stricken or lined through, and the phrase “lower forceps” delivery was inserted in its place. The majority finds no error because in the view of the majority, “the line of questioning [concerning use of the forceps] was irrelevant” since the issue was “whether Dr. Langston should have delivered Cody by C-section rather than some variation of vaginal delivery.” The majority also finds that no error occurred in not allowing cross-examination on the change and/or correction of Dr. Langston’s delivery notes because no one testified that delivery was by any means other than lower forceps delivery.
¶ 26. While it is true that Cody’s expert testified that Dr. Langston should have performed a C-section rather than allowing a vaginal delivery, Cody’s expert also testified that Dr. Langston should not have used forceps, as the use of the forceps to pull the baby down could cause Erb Palsy when shoulder dystocia occurs during delivery. Therefore, I respectfully dissent.
¶ 27. To properly understand why it was prejudicial error not to allow cross-examination of Dr. Langston on his use of forceps and the correction and/or change in his delivery notes, it is necessary that I quote extensively from the record, begin *54 ning with a portion of the testimony of Cody’s expert, Dr. Bernadette Sherman. Dr. Sherman testified as follows:
Q. Could you tell the jury how shoulder dystocia could occur.
A. When the baby descends into the pelvis and it takes time, like it took over three hours with the baby being high, but it takes time, then as the baby comes down to the vaginal floor the head will come out, and it can be a natural delivery, even though when we talk about shoulder dystocia it’s always — not always, but usually, sometimes an instrument delivery where the doctors uses forceps or vacuum suction, it’s an increased risk of shoulder dysto-cia. So, the head comes out and then one of the shoulders is impacted against the anterior frontal pelvic bone. So, if the doctor keeps pulling down then the nerve will be damaged. Some Erb’s Palsies resolve, but if it’s a bad damage then the nerve will be permanently damaged just from pulling the head trying to get the baby delivered, and then you realize that the baby is not coming because the shoulder is impacted and then you do the McRo-bert’s procedure, super pubic pressure. There is even a procedure where you can push the baby’s head back in the vagina and then do a C-Section.
⅝ # :H ⅝ ⅝ ⅜
Q. Dr. Sherman, you agree, don’t you, that once the shoulder dystocia occurred in this case, once this complication was identified, it was appropriately managed by Dr. Langston?
A. Yes, it was.
Q. And the procedures Dr. Langston used during this vaginal delivery were all appropriately performed?
A. Exactly, except with the forceps.
Q. And your criticism of the forceps is that they were used; not that he didn’t use them correctly?
A. Exactly.
Q. And you used, I believe, in your shoulder dystocia case that you were sued on, you used the vacuum, you didn’t use forceps, and you still had_
A. _I used forceps and the vacuum.
Q. So you used both?
A. Right.
Q. And you still had problems?
A. Exactly. Should have been a C-Section.
¶ 28. During the presentation of his defense, the following exchange occurred between Dr. Langston and his attorney:
Q. Doctor, in you opinion, was your use of forceps in this ease, in this delivery, appropriate?
A. Yes, it was.
Q. In your opinion did you do anything inappropriately or negligently that caused this child’s problems?
A. No, I did not.
¶ 29. During cross-examination of Dr. Langston by Cody’s attorney, the following occurred:
Q. Okay. Now, you were asked to read from Williams’ Obstetrics, the learned treatise.
A. Yes.
Q. And I have some pages from the 18th Edition of William’s Obstetrics, and I want you to read these.
A. Okay.
Q. The 18th Edition starting on Page 427, they’re talking about pre-requi-sites for application of forceps. What is the first pre-requisite that they list?
*55 A. The head must be engaged, preferably deeply engaged.
Q. Okay. What does the William’s textbook say about delivery by use of high forceps?
A. Says it should not be done.
Q. What about even after engagement?
A. Even after engagement the higher the station of the baby, the fetal head, the more difficult—
Q. ■ — Okay. So high forces delivery shouldn’t be done?
A. Correct.
Q. What — could you read this highlighted portion right here for me.
A. Therefore, forceps should not be used until the station of the head is low enough to ensure a non-traumatic operative procedure. The same generalization applies to forceps for the fetal distress when the head is not close to the perineal floor. Granted that the fetal heart rate in such a case may suggest that the baby is in jeopardy, it may still be judicious to allow more time for the head to distend rather than super-impose a trauma of a difficult mid-force delivery operation on an already depressed infant.
Q. So, instead of performing the mid-forceps you ought to give more time to allow the baby’s head to come down?
A. That’s possible, yes.
Q. According to William’s?
A. Yes.
Q. Now, on Exhibit—
A. —We’re talking about mid-force delivery.
Q. I know.
A. Okay.
Q. Exhibit P-2 talks about mid-forceps delivery. Page 16, which is your notes.
A. Correct.
Q. What date did you dictate those notes?
BY MR. CORY: May we approach the bench, Your Honor.
BY THE COURT: Yes, sir.
¶ 30. After the bench conference, and further testimony outside the presence of the jury, Cody’s attorney was not allowed to question Dr. Langston further about Dr. Langston’s use of forceps or the change in Dr. Langston’s delivery notes to reflect that “lower forceps” delivery as opposed to “mid-forceps” was utilized.
¶ 31. Even after denying Cody’s counsel the right to cross-examine Dr. Lang-ston about Dr. Langston’s use of forceps, the court allowed the testimony of Dr. Langston’s expert, Dr. James Martin, who testified as follows:
Q. Do you have an opinion in this case about whether the use of forceps by Dr. Langston was appropriate?
A. It was completely appropriate. If he had chosen to use vacuum instead of forceps it would have also been appropriate, given the circumstances that she was in, where she had descended well during the second stage, she brought the baby’s head well down....
¶ 32. On these facts, I believe the trial court clearly abused its discretion in not allowing Cody’s counsel to cross-examine Dr. Langston about Dr. Langston’s use of forceps and the change made in Dr. Lang-ston’s delivery notes. Such error resulted in prejudice to Cody.
¶ 33. As previously noted, while Cody did contend that Dr. Langston was negligent for not delivering him by C-section, that position does not in any way make *56 irrelevant Cody’s counsel’s cross-examination questions regarding Dr. Langston’s use of forceps during the vaginal delivery. First, Dr. Langston himself testified during direct examination that his use of forceps was appropriate. If for no other reason, Cody’s attorney should have been allowed thorough cross-examination to challenge that assertion by Dr. Langston. Second, Cody’s expert clearly testified that forceps should not have been used because there should have been a C-section rather than a vaginal delivery. Third, Dr. Lang-ston’s own counsel questioned Dr. Lang-ston regarding information contained in the same treatise that Cody’s counsel1 was using when Dr. Langston’s counsel objected that the line of questions was irrelevant.
¶ 34. My reading of the record indicates that Cody’s theory of the case was that Dr. Langston was negligent in not opting for a C-section in the very beginning of the delivery process and that by not doing so resulted in his having later to use forceps to assist in extricating Cody. Cody’s expert testified that, because Joan Brumfield, Cody’s mother, was a diabetic and extremely large, Dr. Langston was on notice that she was likely to have a large baby. The expert also testified that Cody’s failure to properly descend down the birth canal was indicative of something being wrong. The expert testified that Cody stayed at the minus one station over three hours when “the standard of care is they have to come down within an hour and a half.”
¶35. On these facts, clearly Cody’s counsel was entitled to cross-examine Dr. Langston about Dr. Langston’s use of forceps during a vaginal delivery that, according to Cody’s proof, should never have been. If forceps should not have been used because a C-section was warranted, using them when the C-section was not done does not, by any means, make their use appropriate. And if forceps are used, as was the case here, that moves the justification for their use to the fore for cross-examination purposes. Since Dr. Lang-ston contended that his use of forceps was proper, directly contradicting Cody’s contention that they never should have been used, I fail to see how cross-examination about their use was irrelevant.
¶ 36. Additionally, I find that the trial court also committed prejudicial error in not allowing Cody’s counsel to question Dr. Langston about Dr. Langston’s lining through the word “mid-forceps” delivery and inserting the phrase “lower forceps” delivery in its place. While Dr. Lang-ston’s testimony that the wording “mid-forceps” was a typographical error or one occurring between the dictation and the translation, Cody should have been allowed to vigorously cross-examine him on that point because the location of the baby in the birth canal drives the decision as to whether and when forceps can be properly used. The term “mid-forceps” delivery indicates that forceps were used when the baby was at a point further up the birth canal whereas the term “lower forceps” delivery indicates that forceps were used when the baby had descended to a point further down the birth canal. The risks of injury to the baby are commensurate with the baby’s location when the forceps are used, that is, the higher the baby, the greater the risks, the lower the baby, the lower the risks. Whether the lining through of the word “mid-forceps” was a typographical, dictation-to-translation error as Dr. Langston contended, or an attempt to recast the facts in a light more favorable to the doctor, was a proper inquiry on cross-examination.
¶ 37. The majority finds no merit in Cody’s argument that his attorney should have been allowed to cross-examine Dr. *57 Langston about the change in Dr. Lang-ston’s delivery notes because, according to the majority, no one testified that delivery was by any other means than lower forceps. It seems to me that the majority fails to appreciate the significance of what occurred. Even in the absence of any testimony that delivery was by mid-forceps, the fact Dr. Langston’s notes initially indicated mid-forceps delivery is reason enough to allow vigorous cross-examination on that point. But more importantly, since the notes were changed in a way that supported Dr. Langston’s contention at trial' — that his use of the forceps was appropriate — -the reason for the change became a proper area to explore on cross-examination. Having said this, I am in no way suggesting that Dr. Langston’s explanation was anything less then truthful. I just believe that cross-examination of the explanation was proper.
¶ 38. For the reasons presented, I respectfully dissent. I would reverse and remand for a new trial with instructions to allow full and complete cross-examination on the subject of Dr. Langston’s use of forceps and the change or correction of his delivery notes. I do not believe that the failure of the trial court to allow such examination on these issues can be dismissed as harmless error.
KING, C.J., JOIN THIS SEPARATE OPINION.